UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| JOHNNY ULMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:02-CV-0560-PPS |
| | ) | |
| ELKHART COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Before the Court are two Motions for Summary Judgment filed by the Defendants. One was filed by the "Merit Board Defendants," consisting of Defendants Ross Albert, Mike Swallow, John Hardy, Bradley Vite, and Harold Truex in their official and individual capacities, and the Elkhart County Sheriff's Merit Board itself. The other motion was filed by what we will call the "Sheriff Defendants," consisting of former Elkhart County Sheriff Thomas Snider, Ted Selman, Warren Allender, John Perry, and Brad Rogers, in their official and individual capacities, and Elkhart County. For the following reasons, these motions are granted in part and denied in part.

I.  FACTS

The Plaintiff in this case, Johnny Ulmer, has been an employee of the Elkhart County Sheriff's Department since November 11, 1985. He was hired by the Sheriff's Department as a jail officer, but he only held that position for about six months, at which point he was asked to join the Elkhart County Drug Task Force that was forming between the State Police, Elkhart City Police, Goshen City Police, and the Sheriff's Department. Ulmer accepted the offer and worked there for approximately four years. While serving on the Drug Task Force, he attended the

Indiana Law Enforcement Academy.

In 1990, Ulmer left the Drug Task Force to join the Patrol Division, where he served for a short time before returning to the Drug Task Force. After eight months, he switched jobs again, this time becoming the Sheriff's Department's Public Relations Officer, a position that he viewed as desirable. He was chosen for the position by Thomas Snider, who was Sheriff at all times relevant to this litigation. While Snider was Sheriff, Ulmer was also chosen to receive specialized training in hostage negotiation, and served on the hostage negotiation team. Ulmer also requested and was permitted to work on a swing shift. The swing shift allowed him to work four days, then take three days off, a schedule that was more conducive to him attending school at the same time.

At some point in the year 2000, Ulmer was permitted to go to the FBI National Academy, an event that Ulmer believes is a highlight of an officer's career. While Snider had the ultimate decision-making authority over sending Ulmer, Ulmer claims that Snider had little to do with the decision, and that he was actually sent because a friend of his in the department arranged it.

In July 2000, a position for Patrol Division Lieutenant became available. Such positions are filled by competitive testing, and a notice about the promotion was posted on July 21, 2000. Three people applied for the position, Ulmer, John Starcevich, and Tom Britton. Snider had final authority in deciding who was qualified to sit for the promotional exam, and all three applicants were permitted to take the test.

The promotional exam consisted of three parts: a length of service computation, a written test, and an oral interview. The raw score from each part was multiplied by a number to weight it, apparently in an attempt to conform with the General Order that required the length of service

2

to be worth 10%, the oral interview to be worth 10%, and the written exam to be worth 80%. Hence, because the length of service raw scores were out of ten, its weighted score was out of one (10*10%). Similarly, because the written exam raw score was out of forty, its weighted score was out of 32 (40*80%). We do not have the scoring sheets for the oral exam, but the evidence indicates that it was worth more than 7.2 points after weighting, since that was the highest score anyone attained on it.

On the day of the exam, the candidates took the written exam in a room together. The exam was made up of 40 questions, Ulmer got 27 correct, Starcevich got 26 correct, and Britton got 20 correct. When the written exam was finished, the candidates went to the oral interview room, where the Promotion Board interviewed them one by one. The Promotion Board was made up of Snider, Detective Lieutenant (then Major) Ted Selman, former Major Warren Allender, and Captain John Perry. Ulmer, being the most senior, was interviewed first.

While the Promotion Board was interviewing candidates, Brad Rogers gathered up the written tests and had them graded. When all of the candidates had completed the oral interview, Rogers tabulated the interview scores from score sheets kept by the members of the Promotion Board. He then added that total to the total from the written exam and the length of service score, which had been calculated the day before. Starcevich had the highest score, and he was chosen for the position.

There were some irregularities that took place during the grading process. When Rogers initially tabulated the scores for the length of service and oral interview scores, he made errors that required him to either scratch out or white out the form. The first error, which happened prior to the day of the exam, involved the length of service calculation. After Rogers had

calculated all three candidates' length of service scores, he realized that he had used the wrong date in Ulmer's employment history to do the calculations. Because the length of service score for each candidate was calculated relative to the other candidates' length of service, this affected all three candidates' scores. Since he had already written the scores down on the summary scoring sheet, he applied white out tape and wrote the correct score on top. The corrected scores were Ulmer 1.0, Starcevich .2648 and Britton .7418.

The second scoring abnormality related to the oral interview portion of the exam. During the oral interview, applicants are asked questions from the board, and the board grades each individual based on the answers they give. Each candidate is asked the same questions as the other candidates. There is no discussion between the board members as they score the interviewees, and the board members do not know the results of the written test or the length of service calculation before scoring the oral interview. During the September 2000 exam, the Promotion Board used oral interview score sheets called Promotional Oral Interview Rating Forms. These forms were given to Rogers to tabulate the totals for every candidate. Ulmer received an oral interview score of 5.425, Starcevich was given a 7.2, and Britton a 5.95. After the exam, the Promotional Oral Interview Rating Forms were destroyed. The destruction appears to have been the practice from when the department began using the forms in 1998 until after Ulmer's exam, but this practice was against official written policy, as the Sheriff's Department's General Order 31100.00 mandated forwarding these forms to the Merit Board for their review.

Instead of retaining the forms, the oral interview scores were copied to the scoring sheet, but they were copied incorrectly. Rogers put Britton's oral interview score of 5.95 in

4

Starcevich's space. Rogers testified that he realized his mistake, so he scratched it out and replaced it with the correct score, a 7.2. In the copy of the scoring sheet provided to the Court as Plaintiff's Exhibit 42, the 5.95 is still plainly visible through the scratch marks, and the 7.2 is squeezed in just above it. After Rogers finished filling the scoring sheet out, he placed it at the end of the table for all three candidates to review. Ulmer also claims that the scoring sheet he saw at that time is different from the one provided to the Court and used during depositions. He claims that the scoring sheet that he saw on the day of the test had white out on the candidates' totaled scores.

When everything was finished, the scoring on the summary score sheet was as follows: Ulmer got 21.6 on the written exam, 5.425 on the oral interview, and 1.0 on the length of service computation, for a total of 28.025; Starcevich got 20.8 on the written exam, 7.2 on the oral interview, and .2648 on the length of service computation, for a total of 28.2648; Britton got 16.0 on the written exam, 5.95 on the oral interview, and .7718 on the length of service computation, for a total of 22.7218. Hence, Starcevich beat Ulmer 28.2648 to 28.025, a difference of only 0.2398. In any case, because Starcevich received the highest total score on the exam, he was recommended to the Merit Board for the position. The Merit Board met on September 18, 2000, and approved Starcevich's promotion, subject to a review of his personnel packet. On October 9, 2000, the Merit Board reviewed his personnel packet and approved him for the promotion.

## II. DISCUSSION

Plaintiff's Complaint is less than clear. He lists a number of statutes under which he is suing, but does not specify which of these statutes apply to which Defendants, and he does not

5

match up the two counts that he lists with any specific statute.  The statutes he names are: 42 U.S.C. §§ 1981, 1981a, 1983, 1985 (3), 1988, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, Title VI of the Civil Rights Act and 29 C.F.R. 1602.14.  At oral argument, Plaintiff's counsel clarified a few things by withdrawing any claims based on Title VI and 29 C.F.R. 1602.14, so summary judgment is granted with respect to those claims.  He also withdrew any claims against Elkhart County, so they are dismissed from the case.

A.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party.  *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 433 (7th Cir. 1994).  The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).  A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In making this determination, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party.  *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999).  The non-moving party must support its contentions with admissible evidence and may not rest upon mere allegations in the pleadings or conclusory

statements in affidavits.  *Celotex,* 477 U.S. at 324.  The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to its case on which the party will bear the burden of proof at trial.  The production of only a scintilla of evidence will not suffice to oppose a motion for summary judgment.  *Anderson*, 477 U.S. at 252.  Employment discrimination cases, while often turning on factual questions, are nonetheless amenable to summary judgment when there is no genuine dispute of material fact or there is insufficient evidence to demonstrate the presence of the alleged motive to discriminate.  *Cliff v. Board of School Comm'r of City of Indianapolis, Ind.*, 42 F.3d 403, 409 (7th Cir. 1994).

B.  Title VII and Section 1981 Claims

    1.  Merit Board Defendants

We turn first to the Merit Board Defendants' claim that Ulmer cannot maintain his Title VII or § 1981 claim against them because they are not his employer.  Neither the Merit Board nor its members employed Ulmer, as the Merit Board has no employees or staff of its own.  Rather, Ulmer was employed by the Elkhart County Sheriff.  It is nearly axiomatic that one must be an employee to bring an employment discrimination claim.  *See Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999) ("Since Vakharia was not an employee, we agree with the district court that her Title VII and ADEA claims must fail.").  Similarly, Section 1981 protects a plaintiff's right to "make and enforce contracts."  42 U.S.C. § 1981.  "There is no dispute, however, that . . . proof of a contractual relationship is necessary to establish a § 1981 claim."  *Walker v. Abbott Laboratories*, 340 F.3d 471, 475 (7th Cir. 2003).  Despite the Merit Board's Motion for Summary Judgment on this basis, Ulmer has not come forward to state what

contractual relationship exists between him and the Merit Board. But as the Merit Board Defendants stated, the clear premise of Ulmer's § 1981 claim is his employment, since he stated in his Complaint that "the defendants violated Ulmer's right to make and enforce contracts by denying him promotion to the rank of Lieutenant because of his race." (Complaint at par. 74). Since his employment relationship appears to be the basis of his § 1981 contract claim, the absence of an employment relationship between Ulmer and the Merit Board also demonstrates the absence of a contractual relationship between the two parties. For these reasons, the Merit Board Defendants' Motion is granted with respect to Ulmer's Title VII and § 1981 claims.

  2. Sheriff Defendants

We now address the most substantively difficult part of Ulmer's claim, his Title VII and § 1981 claims against the Sheriff Defendants. Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a)(1). Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. Under either theory, to prove a claim of disparate treatment, a plaintiff must establish that he is the victim of intentional discrimination on account of his race or national origin. *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999); *see also Patton v. Indianapolis Public Sch. Bd.,* 276 F.3d 334, 338 (7th Cir. 2002) (noting that Title VII and § 1981 discrimination claims are analyzed in the same manner).

A plaintiff may establish § 1981 and Title VII discrimination through either the "direct"

8

or "indirect" method of proof. *Id.* The Plaintiff's briefing in this case was a little unclear as to whether he was proceeding under the direct or indirect method. Because his Response Brief could be read either way, the Court will consider the case under both methods.

In the failure to promote context, in order to defeat a motion for summary judgment using the indirect method, a plaintiff must show that 1) he belongs to a protected class, 2) he applied for and was qualified for the position sought, 3) he was rejected for that position and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff. *See, e.g.*, *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001). If a plaintiff establishes a *prima facie* case, then the burden shifts to the employer to present evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002). If such reason is supplied, then the employee must show that the stated reason is merely a pretext for unlawful discrimination. *Id.*

Using this analysis, the Court finds that Ulmer's case can proceed. The Defendants largely do not contest the first three prongs of Ulmer's indirect case. Instead, they take issue with the fourth prong, that the Elkhart County Sheriff granted the promotion to someone outside of Ulmer's protected class who was not better qualified than him. The Sheriff Defendants argue that Starcevich was qualified for the job, and that is undoubtedly true. But the real issue in indirect cases is whether Starcevich was better qualified than Ulmer, *see Johnson*, 260 F.3d at 732, and that is where things get shaky for the Sheriff Defendants. Ulmer has created a material issue of fact as to whether or not he was better qualified for the position than Starcevich.

The most persuasive part of Ulmer's argument is the scoring of his exam. He makes

9

much of the corrections made on the scoring sheets, but these were plainly clerical errors, and carry little weight with the Court. Rather, Ulmer has created a material issue of fact out of the relative weight attached to the length of service portion of his exam. Neither party has adequately described what actually took place, but as near as the Court can tell from the parties' filings, it appears that Ulmer's length of service score should have counted for a greater portion of his total score, and would have made him the highest scoring candidate, and thus better qualified than Starcevich.

   Sheriff's Department General Order 31102.00 clearly states that the length of service calculation counts for 10% of the final score, with the written examination getting 80% and the oral examination the remaining 10%. Ulmer received a perfect score on the length of service component, that is, he got ten out of ten raw points essentially because he was the longest serving candidate. The other candidates, Starcevich and Britton, received 2.648 and 7.718, respectively. These scores were then multiplied by ten percent, so the three received scores of 1, .2648 and .7718. The scores were then added to the written and oral exam scores, which were also weighted, to come to a total. Ulmer got 21.6 on the written exam, 5.425 on the oral exam, and 1.0 on the length of service computation, for a total of 28.025. The mystery here is how a perfect score on the length of service computation garnered Ulmer only one point, while the equally weighted oral exam got him 5.425. In other words, if the oral interview and the length of service were to receive equal weights of 10% as the Sheriff's General Order so required, and Ulmer got a perfect score on the length of service calculation, then the oral exam should not be worth more than one point on the final scoring sheet. Yet Ulmer got 5.425 points and Starcevich got 7.2 points for the oral part of the exam. Similarly, the written examination should have been

worth no more than eight times a perfect score on the length of service calculation (80% to 10%), but a perfect score on the written exam would have given a candidate 32 points, 32 times the value of a perfect score on the length of service calculation. Considering Starcevich's very small margin of victory, these errors–if they are indeed errors–would have been dispositive, and Ulmer has created a material issue of fact as to whether he was more qualified than Starcevich according to the Sheriff's Department's own formula.

As Ulmer has made a prima facie case of discrimination, the burden now shifts to the Defendants to put forth a legitimate, nondiscriminatory reason for Starcevich receiving the promotion. *Krchnavy*, 294 F.3d at 876.  If such reason is supplied, Ulmer must show that the stated reason is merely a pretext for unlawful discrimination. *Id.*  As the Sheriff Defendants summarized it: "In their summary judgment memorandum, Defendants explained the legitimate, nondiscriminatory reason that they promoted Starcevich over Ulmer: in brief, Starcevich scored higher on the promotional exam than Ulmer did."  (Sheriff Defendant's Reply Brief at p. 3).  The preceding paragraphs make clear that Ulmer has created a material issue of fact as to whether that was true.  But in this part of the analysis, the mistake in scoring could be just that, a mistake, and not a pretext, much less a pretext for discrimination. *See Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 559 (7th Cir. 1987).  But if an employer is trying to hide its real reason for a decision, then "that effort–coupled with the evidence making up the employee's prima facie case–may convince the trier of fact that the real reason needed to be hidden and therefore probably was discriminatory." *Id*.

In this case, Ulmer has created an issue of fact over whether the Sheriff Defendants were trying to hide their decision by presenting evidence that the Sheriff's Department did not save

11

the oral interview forms (which was against written policy), that there were irregular markings and deletions on the scoring sheets, and that the Sheriff's Department possibly made errors when calculating his final score. Adding to the suspicious circumstances is the fact that Sheriff Department happened to give disproportionate weight and lose the scoring sheet to the only portion of the exam, the oral interview, that was scored subjectively. In addition, Ulmer has presented evidence that adds a racial element to the department's hiring practices. Julie Dijkstra, the Administrative Captain who ordinarily administered much of the hiring procedure, admitted that after learning that a minority applicant failed a polygraph test, she gave the polygraph examiner a high five and remarked that they were "zero and four" when it came to hiring minorities. (Dijkstra Dep. at 80). She claims that this remark was made sarcastically, but at this stage of the litigation we must view the facts in a light most favorable to Ulmer. Taken as a whole, this evidence creates a material issue of fact as to whether the Sheriff's Department's stated reason for choosing Starcevich over Ulmer was a pretext for unlawful discrimination. This situation is different from cases like *Friedel v. Madison*, 832 F.2d 965, 973 (7th Cir. 1987), cited by the Sheriff Defendants, in that the Sheriff Defendants are not claiming mistake as their legitimate, nondiscriminatory reason for firing Ulmer. Rather, they steadfastly claim that the results of the test exonerate them. There is a material issue of fact as to whether that is correct.

   The Sheriff Defendants' Motion for Summary Judgment can also be denied under the direct method of proof based mainly on the same evidence. Under the direct method of proof, there are two types of permissible evidence. First, there is direct evidence, or evidence that, if believed by the trier of fact, would prove the fact in question "without reliance on inference or presumption." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (internal quotation

omitted).  Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* (internal quotation omitted).  Ulmer does not have any direct proof, so he is relying exclusively on the second type of evidence permitted under the direct method, which relies more on circumstantial evidence and allows a plaintiff to prevail by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citing *Troupe v. May Dep't Store Co.*, 20 F.3d 734, 737 (7th Cir. 1994)).  The circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action."  *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

In *Troupe*, the Court identified three types of circumstantial evidence of intentional discrimination: (1) suspicious timing, ambiguous statements, and behavior toward or comments directed at other employees in the protected group;  (2) evidence that employees similarly situated to the plaintiff but outside the protected class received systematically better treatment; or (3) evidence that the plaintiff was qualified for a job in question, but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.  *Troupe*, 20 F.3d at 736.   Each type of circumstantial evidence can be used on its own or in conjunction with the other types of circumstantial evidence to establish discrimination.  *Id.*; *see also Gorence v. Food Center, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

All of the evidence mentioned in the pretext discussion for the direct method also applies to the analysis here.  It fits squarely into the third type of evidence described in *Troupe*, evidence that Ulmer was qualified for the job, but passed over in favor of a white person and that the

13

Sheriff Defendants' stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. As discussed above, Ulmer has created a fact issue over whether or not–by the Sheriff's Department's own guidelines–he was passed over for a less qualified white candidate. Likewise, the Sheriff's Department's stated reason for the difference in treatment, that Ulmer did worse on the exam, does not stand up to scrutiny. The destruction of the oral interview scoring sheets despite policies requiring otherwise, the irregular markings and deletions on the scoring sheets, the under-weighting of the length of service calculation, and the racial remark by someone heavily involved in the Sheriff's hiring process also all cast doubt on the Sheriff Defendants' explanation for the difference in treatment. Taken together, this evidence points directly at a discriminatory reason for the employment action, or so a jury could find, and it allows Ulmer's case to survive under the direct method of proof as well.

To summarize, under either method, issues of material fact include, but are not limited to: (1) whether the test was properly scored, (2) whether, if not properly scored, the scoring error was a pretext for discrimination and not merely a mistake, (3) whether the irregular markings and deletions on the scoring sheets were caused by score manipulation, and (4) whether Julie Dijkstra's "zero and four" remark was made sarcastically.

Although Ulmer's case may proceed, there are some problems with the parties against whom he brings these claims. With respect to the Title VII action, Ulmer names a number of defendants in their individual capacity, but individuals are not proper parties to a Title VII action. *Gastineau v. Fleet Mortg. Corp.*, 137 F.3d 490, 493 (7th Cir. 1998). Thus, the motion concerning Ulmer's Title VII claims is granted with respect to all parties but the official capacity Sheriff Defendants.

In addition, there are problems with the parties to Ulmer's § 1981 case. Section 1981 liability cannot be based on respondeat superior. *Smith v. Chicago School Reform Board of Trustees*, 165 F.3d 1142, 1148 (7th Cir. 1999). Demonstrating that an executive official, even a high-ranking one, engaged in discrimination is insufficient. *Id.* A plaintiff must show that the governmental entity's official policy or custom was discriminatory. *Id.* Ulmer claims that the department has a policy and custom of destroying the oral interview rating forms, but that in and of itself is hardly discriminatory.[1] At most, this evidence is something like sloppy record-keeping, a policy that might allow discrimination to happen, but it is not in itself discriminatory. It is not enough to establish the necessary discriminatory custom or policy for a § 1981 claim against a governmental entity. Thus, his § 1981 claims against all official capacity and governmental Defendants fail. Further, the only remaining defendants are individuals who do not have a contractual relationship with Ulmer. Such a relationship is necessary in § 1981 cases. *Walker*, 340 F.3d 471, 475 (7th Cir. 2003) ("There is no dispute, however, that . . . proof of a contractual relationship is necessary to establish a § 1981 claim."). With that, all of Ulmer's § 1981 claims are now gone. The only discrimination claim left is Ulmer's Title VII claim against the Sheriff Defendants in their official capacities.

C. Equal Protection Claims

All Defendants also move for summary judgment as to Ulmer's equal protection claims under 42 U.S.C. § 1983 on the basis that Ulmer cannot show discriminatory intent. Although a

---

[1] Ulmer has not argued that the decision was made by a policymaker, so the Court has not considered that issue and it is deemed waived. *Robyns v. Reliance Std. Life Ins. Co.*, 130 F.3d 1231, 1237-38 (7th Cir. 1997) (noting that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered and the failure to so inform the court waives right to argue the issue on appeal).

number of Seventh Circuit cases imply that a separate showing of intent is required in Section 1983 claims, the court has clarified that the same standards apply to these claims (in the employment context) and Title VII claims. *Williams v. Seniff*, 342 f.3d 774, 788 n. 13 (7th Cir. 2003). The *Williams* court explained that cases that appear to require a showing of discriminatory intent as a separate requirement "are best read as simply emphasizing the requirement that § 1983, like disparate treatment cases under Title VII, require ultimately proof of discriminatory intent." *Id*. The indirect and direct methods of proof are available to plaintiffs in § 1983 cases just as they are in Title VII cases. *Id.* at 788. Thus, for the same reasons as with Ulmer's Title VII and § 1981 claims, summary judgment is denied. This denial is only with respect to the motions filed by the Sheriff Defendants, as Ulmer has admitted that the Merit Board merely rubber-stamped the decisions of the Sheriff, so he cannot show the requisite intent. (Plaintiff's Response at p. 16).

D.  Due Process Claims

The Defendants also move for summary judgment with respect to Ulmer's § 1983 due process claims. The due process clause of the Fourteenth Amendment forbids a state to deprive anyone of life, liberty, or property without the due process of law. U.S. Const. amend. 14, § 1. Thus, in order to succeed on this claim, Ulmer must first show that he was deprived of life, liberty, or property. "To have a protectable property interest, a plaintiff must show a legitimate claim of entitlement, not just a hopeful expectation." *Beischel v. Stone Bank School Dist.*, 362 F.3d 430, 435 (7th Cir. 2005). A plaintiff bears the burden of showing that he has a protectable property interest. *Crull v. Sunderman*, 384 F.3d 453, 465 (7th Cir. 2004). Seventh Circuit law holds that an employee does not have a property right in a promotion if the decisionmaker has

16

discretion to award or deny the promotion. *See*, *e.g., U.S. v. City of Chicago*, 869 F.2d 1033, 1036 (7th Cir. 1989) (stating that Illinois law and the Chicago Municipal Code gave authorities unfettered discretion to choose from among the five highest rated applicants for each available promotion, so plaintiff had no property interest in the promotion); *Miller v. Henman*, 804 F.2d 421 (7th Cir.1986) (holding when there are no binding substantive criteria, when a decision cannot be "wrong," there is no constitutionally protected property interest); *Bigby v. City of Chicago*, 766 F.2d 1053, 1057 (7th Cir. 1985) (finding that the promotion from sergeant to lieutenant was one of discretion, and that it "is not governed by fixed rules which if complied with automatically entitle the applicant to promotion").

Ulmer has stated that the Merit Board merely rubber stamped the recommendations of the Sheriff. While that may be, he has offered no evidence to show that the Merit Board did not officially have the discretion to deny him the promotion notwithstanding the results of the Sheriff's test. The General Orders state that the person with the highest score from the testing is to be "recommended by the Sheriff to the Merit Board for promotion." (G.O. 31100.00 at p. 8). It is unclear from the evidence before the Court what role the Merit Board has in actually deciding on whether the person recommended to it gets the job. The General Orders provided to the Court are silent on the issue, but the slim evidence before us shows that the Merit Board had some discretion in granting promotions, as they only conditionally granted Starcevich's promotion until they could fully review his personnel file. Against this, Ulmer has not presented any evidence that shows that the Merit Board lacked discretion to grant or deny a promotion

17

after receiving the results of the testing.[2]  Since he bears the burden of demonstrating a property interest protected by the due process clause, this lack of evidence is fatal to his claim.  Thus, all Defendants' Motions for Summary Judgment are granted with respect to Ulmer's § 1983 Due Process claim.

E.  Conspiracy Claims

Plaintiff has also alleged a conspiracy to deprive him of his civil rights under both § 1983 and § 1985(3).  Under either statute, a plaintiff must show that the conspirators agreed to deprive him of his constitutional rights or inflict injury upon him.  *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) ("To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that . . . a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights."); *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002) (holding that § 1985(3) cases require a showing that the alleged conspirators acted with a single plan, the general nature and scope of which was known to each conspirator).  Circumstantial evidence can suffice, but it must not be pure speculation.  *Seniff*, 342 F.3d at 785; (with regard to § 1983 cases, "[a]lthough a conspiracy certainly may be established by circumstantial evidence, we have stressed that such evidence cannot be speculative"); *Green*, 281 F.3d at 665-66 (holding that a § 1985(3) agreement may be inferred from circumstantial evidence, but only if a reasonable jury could conclude that a meeting of the minds occurred and that the parties had an understanding to achieve the conspiracy's objectives).

In this case, the record contains no real evidence, circumstantial or otherwise, of any

---

[2] Ulmer's Brief was somewhat confusing, and it can fairly be read as abandoning this claim altogether.

agreement between any of the parties involved in this litigation to deprive Ulmer of his civil rights.  Citing a criminal case, Ulmer puts forth the "cooperative relationship" that existed between the Sheriff and the members of the Merit Board as evidence of an agreement.  His examples of this cooperation are the Merit Board's acceptance of the scratch-outs, white-outs, and errors without any explanation in the minutes of their meeting.  (Pl.'s Response Brief at p. 17).  He also reiterates nearly all of his evidence regarding discrimination, none of which points to any sort of agreement between the parties.  No rational jury could infer from these meager facts an understanding or agreement to deprive Ulmer of his civil rights.  For these reasons, all Defendants' Motions for Summary Judgment regarding Ulmer's conspiracy claims are granted.

F.  Motions to Strike

The Sheriff Defendants and the Merit Board Defendants have moved to Strike some affidavits provided by the Plaintiff, but the Court has not substantially relied on any of the material contained therein, so those motions are denied.  Ulmer has moved to strike the Defendants' Reply Brief and Supplemental Statement of Material Facts as being oversized and raising new arguments.  Because the Court did not rely on any of the new arguments raised in the Reply briefing, that motion is also denied.

III.  CONCLUSION

For these reasons, the Defendants' Motions [Docket Nos. 41 and 47] are **DENIED IN PART AND GRANTED IN PART**.  The claims remaining are a Title VII and a § 1983 equal protection claim against Thomas Snider, Ted Selman, Warren Allender, John Perry, and Brad Rogers, in their official capacities.  As there are no remaining claims against Ross Albert, Mike Swallow, John Hardy, Bradley Vite, and Harold Truex in their official and individual capacities, or Elkhart County and the Elkhart County Sheriff's Merit Board, they are all **DISMISSED** as Defendants.  The Motions to Strike [Docket Nos. 69, 71, and 81] are **DENIED**.  Plaintiff's Motion for Leave to File Belated Request for Hearing [Docket No. 60] is **DENIED** as moot.

    **SO ORDERED**.

    ENTERED: August 9, 2005

                                                  s/ Philip P. Simon
                                                  PHILIP P. SIMON, JUDGE
                                                  UNITED STATES DISTRICT COURT